Casey, O. J.,
delivered the opinion of the court:
The claimant brings this suit to recover the net proceeds of 106 bales of upland cotton, under the third section of the act approved March 12, 1863. In 1861 and 1862 the claimant was the owner of a plantation in Lafayette county, Mississippi, upon which he resided. Some time in the latter year he removed to another plantation in Panola county, in the same State. He left stored upon the plantation in Lafayette county the cotton claimed in this case. In December, 1862, a military expedition of the forces of the United States having-penetrated into the region where this cotton was stored, it was taken by the military, sent to Memphis, and there sold with other lots of cotton taken from other parties. The net amount of the proceeds *360 have been paid into the treasury of the United States. Mr. Bar-ringer proves by a number of witnesses that he owned the cotton, and that it was stored, upon his plantation, and most of it produced by himself on his own land. He proves that it was taken away by the military authorities of the United States.
Mr. Stephen W. Wilkins, the military cotton agent at Memphis, proves that the same number of bales of cotton marked with Mr. Bar-ringer’s name across the bales, was received by him for Captain A. R. Eddy, quartermaster at Memphis. And the same witness and Colonel Eddy prove that the cotton was sold either in January or February, 1863. The cotton was not sold by itself, but mixed with other lots of captured cotton sold at the same time. The net amount of sales of captured and abandoned property by Colonel Eddy amounted to $587,614 54. The following document shows it was regularly covered into the treasury of the United States :
“B. [Miscellaneous. — No. 167, Second Quarter of 1865.]
“ To Captain A. R. Eddy :
“At sight pay to the Treasurer of the United States, or order, for the use of the said States, $587,614 54, on account of captured and abandoned property, pursuant to an act of Congress, approved March 12;, 1863, &c.
“ And for so doing this shall be your warrant.
“Given under my hand and the seal of the treasury this 29th day of May, A. D. 1865, and of independence the 89th.
“H. McCulloch,

“ Secretary of the Treasury.

“Received June 17, 1S65.
F. E. Spinner,
“ Treasurer United States..
“ $587,614 54.
“Countersigned.
“ R. M. TayloR,
“ Comptroller.
“ Recorded.
“ J. A. GRAHAM,
“Acting Assistant Register- •
“Payment by war warrant, No. 4394, dated 29th May, 1865.”
The claimant’s counsel alleges that Barringer’s cotton was sold in ai .lot of 272 bales, on the 19th of February, 1863, at eighty and one- *361 half cents per pound. But the evidence leaves this in doubt. Stephen W. "Wilkins says, that the cotton “ was sold in the month of February, 1863, to the highest bidder, "Wilson King.” The cotton was put up at auction in lots of 50 bales. There were 500 bales sold at that sale. Colonel Eddy himself gives no facts to show when this particular lot was sold. He proves, however, that he held one sale on the 21st January, 1863, at which he sold five hundred bales. The sale amounted to $137,287 56. On the 19th of February he sold two hundred and seventy-two (272) bales to the same purchaser, at 80|-cents per pound, amounting to $99,948 80.
How, is Wilkins mistaken in saying that this cotton was sold in February ? The only sale proved to have been made by Colonel Eddy in February was the 272 bales. Wilkins says Barringer’s cotton was sold in a lot of 500 bales. This the evidence of Colonel Eddy shows was on the 21st January, 1863. The witnesses all say this cotton was in good order, and in this Wilkins, the agent, concurs. There was no occasion to repack or rebale it before selling. It was taken in December, 1862. It would likely arrive at Memphis early in January, 1863. The vouchers of Captain Metcalf, quartermaster, who captured the cotton and brought it to Memphis, shows that on the 2d January, 1863, he turned over to Colonel Eddy 222 bales of cotton, on the 4th 125 bales, and on the 7th 123 bales. It is entirely probable that Barringer’s was in one of these lots, and, being in good order, would be ready for sale on the 21st. January, 1863. But in view of the discrepancy in the testimony, and the uncertainty as to which lot sold contained Barringer’s cotton, we have thought the fairest way was to take the average per bale of the two sales in January and February, 1863, $307 30 per bale.
It is unnecessary to set forth the testimony in detail, by which the claimant establishes his ownership to the property and his claim upon the proceeds. This is shown by the testimony of disinterested witnesses, who speak from their own distinct personal knowledge of his-production, possession, and ownership of the cotton. And that fact is fully established to our entire satisfaction.
As to the claimant’s loyalty and fidelity to the government of the United States, it is fully made out. The claimant shows by the testimony of his neighbors, with most of whom he differed, that he voted and used his influence against the secession of the State of Mississippi, and consistently adhered to his sentiments throughout the rebellion; expressing them on all proper occasions as far as it was. prudent or safe for him to do. So strong and open was he in express *362 ing bis Union sentiments that the witnesses say, that hut for his high social standing and character and his age he would have been subject to personal violence. This is followed up during the whole period of the war so as to bring him within the letter of the act of March 13,1863 — that he “never gave aid or comfort to the rebellion.” Since the argument of the cause the claimant himself has been produced before one of the judges of this court and fully examined by his counsel, and cross-examined by the solicitor for the United States, both on the question of ownership and loyalty. The result of all the testimony, after a long, patient, and careful consideration, has satisfied us on both points. We are entirely satisfied that he was the bona fide owner of the 106 hales of cotton taken — that it was sold and the net proceeds paid into the treasury of the United States; and that he never gave aid or comfort to the rebellion ; and that he is consequently entitled to recover-the net amount for which his property w;as sold after deducting lawful charges and expenses.
On the argument of the cause, it was contended by the solicitor for the United States that the claimant’s case did not come within the provisions of the act of March 12, 1863, because the property was captured and sold by the millitary before the date of its passage. Standing on the act of 1863, alone, this objection would probably be fatal. But in connection with the 3d section of the act of July 2, 1864, (13 Stat. L., p. 375,) by which the act of 12 th March, 1863, is extended so as to include the descriptions of property mentioned in the act of July 13, 1861, and the act of July 17, 1862, we think our jurisdiction can be sustained. This property was captured by the military because it was supposed the owner came within some of the clauses designated in the act of July 17,1862, whose property should be seized-and forfeited. But, by the provisions of the seventh section of that act, it was necessary to secure a judicial condemnation of the property before it could be sold, and directs the court in which such property, after seizure, may be libelled. “And if said property, whether real or personal, shall be found to have belonged to a person engaged in rebellion, or who has given aid or comfort thereto, the same shall be condemned as enemies’ property, and become the property of the United States, and may be disposed of as the court shall decree, and the proceeds thereof paid into the treasury of the United States, for the purposes aforesaid.” We think the reason, spirit, and intent of this law covers this case, and brings it within the provisions of the act of 12th March, 1863. The different executive departments of the government have given that construction to it, by having specific accounts *363 made of tbe property seized and sold, and having those accounts adjusted between the War and Treasury Departments, and having the proceeds placed in the treasury to the credit of the captured and abandoned property fund. Upon every view we have been able to take of this case, we find nothing which should prevent the plaintiff’s recovering. The average proceeds of the cotton sold in January and February, 3863, was $307 30. At this rate the claimant’s 106 bales will amount to thirty-two thousand five hundred and seventy-three dollars and eighty cents, ($32,573 30.) And this sum we award to him in the usual form.